# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

**UNITED STATES OF AMERICA**,

        **Plaintiff,**

**v.**

**LINDA M. SPENCER, MARGARET A. VACCARO, THOMAS BEIER, and MIDFIRST BANK**,

        **Defendants.**

        **MEMORANDUM OF LAW AND ORDER**
        **Civil File No. 04-141 (MJD/SRN)**

---

Teresa Dondlinger Trissell and Jennifer K. Brown, United States Department of Justice, for Plaintiff.

Linda M. Spencer, <u>pro</u> <u>se</u>.

Margaret A. Vaccaro, <u>pro</u> <u>se</u>.

Thomas Beier, <u>pro</u> <u>se</u>.

Lawrence P. Zielke, Shapiro & Nordmeyer, for Defendant MidFirst Bank.

---

## I.    INTRODUCTION

This case arises out of an action on behalf of the Government to (a) reduce to judgment certain federal tax assessments made against defendant Linda M. Spencer; (b) obtain a judicial determination that defendant Margaret A. Vaccaro is the alter ego or nominee of Linda M. Spencer, and to foreclose federal tax liens

1

on certain real property held in Margaret A. Vaccaro's name; (c) to set aside the fraudulent conveyance of certain real property by Linda M. Spencer; and (d) to foreclose federal tax liens on that real property. The case is now before the Court on cross motions for summary judgment. Oral argument was heard on September 9, 2005.

## II.    FACTUAL BACKGROUND

Spencer earned income in 1993, 1994, and 1995 from a business owned equally by Spencer and her ex-husband, Defendant Thomas Beier. Spencer failed to file income taxes for those years and as of November 2003 had amassed a tax liability, including interest and penalties, of $359,553.33. Interest and penalties continue to accrue.

On April 5, 1993, Beier transferred the property at issue, a house located in Washington County, Minnesota ("the house"), to Spencer by quitclaim deed. In September 1996, the IRS sent Spencer a letter telling her to meet with an IRS agent to discuss her unpaid income taxes.

On February 26, 1997, Vaccaro – Spencer's mother – paid Spencer's mortgage company $7075.09 to reinstate Spencer's mortgage on the house and avoid foreclosure. (Def. Ex. 1.) On April 10, 1997, Spencer met with an IRS officer after rescheduling the meeting several times. (Pl. Ex. B.) On April 15, 1997, Vaccaro recorded a $15,000 mortgage lien on the house. On January 29, 1998,

Vaccaro paid $2047.76 to the mortgage company to again avoid foreclosure on the house. (Def. Ex. 2.) On that same day, Spencer transferred the house by quitclaim deed to Vaccaro ("the transfer"). On February 8, 1999, the IRS assessed Spencer with back tax liabilities and served her with copies of the assessments and demands for payment.

Spencer continues to live in the house, and the Parties agree that the household bills are still listed in Spencer's name. When Spencer works, part of her paychecks are deposited into Vaccaro's checking account, the account from which Vaccaro has written the mortgage and household expense checks since the transfer.

## III.   DISCUSSION

### A.   <u>Summary Judgment Standard</u>

Summary judgment is appropriate if, viewing all facts in the light most favorable to the non-moving party, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Chelates Corp. v. Citrate,</u> 477 U.S. 317, 322-23 (1986).  The party seeking summary judgment bears the burden of showing that there is no disputed issue of material fact. <u>Id.</u> at 323.

3

**B.**    **The Government's Motion for Partial Summary Judgment**

The Government seeks an order reducing to judgment the tax assessments made against Spencer. Spencer does not object to the Government's motion, and admits that she cannot accurately recall her income and expenditures from 1993 to 1995. Spencer now concedes that the Government's calculations are likely correct. Likewise, Defendant MidFirst Bank does not oppose the Government's motion. Accordingly, the Government's motion for partial summary judgment is granted.

**C.**    **Spencer and Vaccaro's Motion for Partial Summary Judgment**

Defendants Linda Spencer and Margaret Vaccaro seek partial summary judgment dismissing the Government's claim that Vaccaro is the alter ego or nominee of Spencer, dismissing Vaccaro from this case with prejudice, and denying the Government's motion to foreclose the tax liens on real property held in Vaccaro's name. Defendants argue that Vaccaro, not Spencer, is the rightful owner of the house. The Government responds with two alternative theories under which Spencer retains an interest in the house. First, the Government argues that the transfer was fraudulent and must be set aside. Once the transfer is set aside, the property will be in Spencer's name and the tax liens can attach to the house. Second, the Government avers that Vaccaro is actually Spencer's alter

4

ego or nominee, and therefore the federal tax liens attach to the house owned by Vaccaro.

### 1.    **Whether the Transfer was Fraudulent**

A federal tax lien attaches to property that has been fraudulently transferred. United States v. Williams, 514 U.S. 527, 539 (1995); United States v. Jones, 631 F. Supp. 57, 60-61 (W.D. Mo. 1986). When property is fraudulently transferred, the liability to the Government is determined by state law. Comm'r v. Stern, 357 U.S. 39, 45 (1958); American Bonding Co. v. Hord, 98 F.2d 350, 352 (8th Cir. 1938). Under Minnesota law, a transfer may be proven fraudulent without proof of actual intent to harm creditors. Metro. Steel Fabricators, Inc. v. Michalski, 191 B.R. 150, 153 (Bankr. D. Minn. 1996). The Minnesota Fraudulent Transfer Act provides remedies to creditors who are hurt by a debtor's fraudulent transfers. Id. In relevant part, the Act provides the following:

 (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

  (1)    with actual intent to hinder, delay, or defraud any creditor of the debtor; or

  (2)    without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
.   .   .
   (ii)    intended to incur, or believed or reasonably should have believed that the debtor would incur,

5

> debts beyond the debtor's ability to pay as they
> became due.

Minn. Stat. § 513.44(a). The Court will address each prong if the statute

separately.

## a.  <u>Whether Spencer Had the Intent to Defraud</u>

When determining actual intent under § 513.44(a)(1), the Court may

consider, <u>inter alia</u>, whether:

(1)   the transfer or obligation was to an insider;

(2)   the debtor retained possession or control of the property
transferred after the transfer;

(3)   the transfer or obligation was disclosed or concealed;

.    .    .

(5)   the transfer was of substantially all the debtor's assets;

(6)   the debtor absconded;

(7)   the debtor removed or concealed assets;

.    .    .

(8)   the value of the consideration received by the debtor was
reasonably equivalent to the value of the asset transferred or the
amount of the obligation incurred;

(9)   the debtor was insolvent or became insolvent shortly after the
transfer was made or the obligation was incurred; [and]

(10)   the transfer occurred shortly before or shortly after a
substantial debt was incurred.

Minn. Stat. § 513.44(b). Although the Court may consider these factors, the

statute does not compel any particular inference from the analysis of them. <u>Jolly's</u>

6

Inc. v. Norman Vinitsky Residuary Trust, 188 B.R. 832, 840 n.15 (D. Minn. Bankr. 1995).

The Court finds that Spencer did not have the intent to defraud the Government at the time of the transfer. Although the transfer was to Vaccaro, an insider, and although Spencer remained on the property, an analysis of all the facts demonstrates that Spencer did not have a tax lien against her at the time, and that Vaccaro did not know about Spencer's tax problems.

Spencer has admitted that she was under the influence of drugs at this time, and was unable to meet her obligations. The house was on the brink of foreclosure twice, and Vaccaro saved the house for Spencer and Spencer's children twice. After stopping foreclosure proceedings two times, Vaccaro wisely insisted that the house be transferred to her to protect her investment in it. Vaccaro has paid all the house payments since the transfer.

The fact that Spencer continues to live in the house has been explained to the Court's satisfaction: Vaccaro wanted her grandchildren to remain the house. Vaccaro spoke during oral argument, and the Court found her statements credible. Currently, Vaccaro is acting like a landlord to Spencer, making capital improvements to the house such as installing a new furnace and a new hot water heater. These actions are the actions of a landlord seeking to protect her investment.

The Court also finds that the transfer was for reasonably equivalent value. The Government asserts that the value of the house should be based on market value plus ten percent. Vaccaro and Spencer respond that at the time of the transfer, the house was in disrepair and was not valued at anywhere near the amount the Government asserts.

Whether a transfer is for reasonably equivalent value is a question of fact. Metro. Steel Fabricators, 191 B.R. at 154 (citing Jacoway v. Anderson, 850 F.2d 342, 344 (8th Cir. 1988)). The burden is on the Government to show by a preponderance of the evidence that the Spencer did not receive reasonably equivalent value for a transfer. Id. (citation omitted). "The court must consider all aspects of the transaction and 'carefully measure the value of all benefits and burdens to the debtor.'" Id. (citation omitted).

When a house is in foreclosure, the fair market value is not a proper measure of its value because the market for a foreclosed property has been redefined. See BFP v. Resolution Trust Corp., 511 U.S. 531, 548 (1994). Rather, the reasonably equivalent value of a property sold in a properly conducted foreclosure sale is the sale price. Id. at 544 (defining "reasonably equivalent value" in the context of the U.S. Bankruptcy Code). See also In re Nelson, 495 N.W.2d 200, 201, 202-03 (Minn. 1993) (finding that $900 payment for property worth

8

$100,000 in which the owner had $43,500 in equity did not shock the conscience because the owner had the right to redeem the property within a year).

In this case, the county's estimate of the house's market value at the time of the transfer was $93,500. The Government argues that Washington County routinely undervalues property in its records, and that the fair market value was therefore about $10,000 more than this. The Court does not accept this argument. The house was in foreclosure and in disrepair at the time of the transfer. Thus, the Court will begin its calculations with a market value of $93,500. From this amount, the Court must subtract the amount owed on the mortgage at the time of the transfer. The Government argues that the amount owed at the time of the transfer was "estimated at $40,000." (Pl. Ex. B., Chandler Decl. ¶ 7.) Defendants respond that the amount owed at the time of the transfer was $47,000. This is based on the following calculation. At the time Vaccaro stopped the first foreclosure proceeding, $49,094.22 was owed on the mortgage. (Def. Ex. 1, Notice of Foreclosure Sale.) From this amount, Spencer and Vaccaro subtracted $2094.22 which is an estimate of the amount applied to the mortgage at the time Vaccaro stopped foreclosure. (Def. Resp. Supp. Mot. Summ. J. at 4.)

Since Vaccaro and Spencer are the moving parties, the Court must look at the facts in the light most favorable to the Government. Therefore, the Court will use $40,000 as the amount owed at the time of the transfer. From this amount,

the Court must subtract $7500, the amount of Beier's lien; and $15,000, the amount of Vaccaro's lien.[1] This leaves Spencer with equity of $30,5000. It is undisputed that Vaccaro paid $9122.85 to save the house twice from foreclosure, and that these transactions provided the basis for the transfer.

The Court finds that under the circumstances, this was sufficient consideration for the transfer. A $93,000 market value certainly over-estimated the value of the house at the time of the transfer, when it was on the brink of foreclosure and in disrepair.

Furthermore, consideration is not always measured in dollars. See Metro. Steel Fabricators, 191 B.R. at 154 (finding that debtor's noncompete agreement and willingness to consult provided reasonably equivalent value received for the transfer of monies and real property). In this case, Spencer received additional consideration in being able to walk away from the threat of foreclosure and an untenable financial situation, and in being allowed to keep her children in their home. Moreover, since Vaccaro now owns the house, there is likely loan forgiveness for any monies owed to Vaccaro for the expenses she incurred in helping Spencer keep and maintain the house over the years.[2] Loan forgiveness

---

[1] The Government does not take issue with this mortgage, and uses this figure in its calculation of the amount owed on the mortgage.

[2] Defendants assert that Vaccaro has provided Spencer with money several times over the years. It is a bit unclear whether this is already included in the

can serve as consideration. <u>Neubauer v. Cloutier</u>, 122 N.W.2d 623, 630 (Minn. 1963).

Although the transfer represented all of Spencer's assets, the Court does not find that fact probative in this case. Spencer was going to lose the house with or without Vaccaro's intervention. This is not a situation in which a debtor who senses an impending lien voluntarily surrenders property that she would otherwise have in her possession when the lien eventually attaches. Spencer was never going to have the house in her possession again after the March 14, 1997 foreclosure sale unless she redeemed the house within six months of the sale. (Def. Ex. 1.) Redemption would have been impossible given Spencer's lack of income in 1997 and 1998.

In addition, the fact that Spencer's tax lien was assessed shortly after the transfer does not mean that the transfer was completed in order to avoid creditors. The transfer occurred when it did because that was when the house was on the brink of foreclosure for the second time.

Other indicia that the transfer was not fraudulent are the fact that neither Vaccaro nor Spencer made any attempt to conceal the transfer and that neither Spencer nor Vaccaro absconded after the transfer. Spencer has never claimed that she does not live in the house, and Vaccaro has provided convincing reasons for

---

$15,000 lien and the mortgage reinstatement payments.

allowing Spencer to remain in the house. The Court further finds that it is

Vaccaro, not Spencer, who exercises control and dominion over the house.

Vaccaro has stated under oath that she makes all the decisions regarding the care

and upkeep of the house.[3] At oral argument, Vaccaro stated that she paid for a

new furnace and new hot water heater for the house. Moreover, Vaccaro has paid

the mortgage and taxes since the transfer. Although Spencer continues to live in

the house, she does not retain control over the house and does not take a tax

deduction for the mortgage payments.

Thus, the Court finds that the transfer was not intentionally conducted to

hinder, delay, or defraud a creditor. Therefore, the transfer may not be set aside

on this basis.

> **b.    Whether Spencer Did Not Receive Reasonably Equivalent Value for the House, and Should Have Believed She Would Incur Debts Beyond Her Ability to Pay**

The Court has already concluded that Spencer received reasonably

equivalent value for the transfer. In addition, the Court finds that Spencer did not

reasonably believe she would incur debts beyond her ability to pay. The Court

---

[3]Although the interrogatory answers presented in the Parties' moving papers do not contain signature blocks and notary stamps, the Government does not take issue with format of these answers. The interrogatory instructions stated that the answers should be given under oath. The Court therefore assumes that these pro se interrogatory responses are true and correct to the best of the Defendants' knowledge.

finds credible Spencer's arguments that due to her drug addiction and past

lifestyle, she did not believe that she would ever be assessed tax liabilities for the

business income she and her husband earned in from 1993 to 1995. Spencer

testified in her deposition that from 1993 to 1995, her husband handled their

business affairs and that she was unable to remember many details of that time

since she was using cocaine and heroine during that time period. Spencer has also

stated that she was "destitute" during this time, and found it implausible that she

would ever be assessed with a tax bill. The Court finds that under the

circumstances, Spencer should not have believed that she would incur a debt she

is unable to pay. Therefore, the transfer may not set aside on this basis either.

## 2.     **Whether Vaccaro is Spencer's Alter Ego or Nominee**

Federal tax liens attach to the property of a nominee or alter ego. <u>G. M.</u>

<u>Leasing Corp. v. United States</u>, 429 U.S. 338, 351 (1977); <u>F.P.P. Enter. v. United</u>

<u>States</u>, 830 F.2d 114, 117-18 (8th Cir. 1987). "Alter ego means 'other self' - where

one person or entity acts like, or, for another to the extent that they may be

considered identical." <u>United States v. Scherping</u>, 187 F.3d 796, 801 (8th Cir.

1999) (quotation omitted). The Government may collect the tax debts of a

taxpayer from assets of an alter ego. <u>Id.</u> (citing <u>G. M. Leasing</u>, 429 U.S. at 350-51.)

Courts usually look to state law to determine if a corporate entity is an alter ego.

<u>Id.</u> at 802. The burden is on the party asserting the existence of an alter ego

relationship to prove that such a relationship exists. <u>Davis v. Johnson</u>, 415 N.W.2d 755, 759 (Minn. Ct. App. 1987) (party seeking to pierce corporate veil under alter ego theory bears the burden of proof).

Most Minnesota cases analyzing whether an alter ego relationship exists, analyze the relationship between a corporate entity and an individual or the relationship between two corporations. <u>See</u> <u>In re Lewensten</u>, Nos. 4-88-823, 4-88-186, 1989 WL 38623, at *4 (Bankr. D. Minn. April 20, 1989) (unpublished opinion); <u>Waterman v. Harold</u>, No. C5-89-2978, 1990 WL 92869, at *1 (Minn. Ct. App. July 10, 1990) (unpublished opinion). The question of whether a corporate entity is an alter ego of another corporation is primarily a fact question. <u>Nat'l Bond Fin. Co. v. General Motors Corp.</u>, 341 F.2d 1022, 1022 (8th Cir. 1965). Under Minnesota law, when the courts conduct an alter ego analysis, they focus on "how the corporation operated and the defendant's relationship to that operation." <u>Lewensten</u>, 1989 WL 38623, at *4 (quoting <u>Victoria Elevator Co. v. Meriden Grain Co.</u>, 283 N.W.2d 509, 512 (Minn. 1979)). In the context of the instant case, the analysis will focus on Spencer's relationship to the house.

The Court should consider the following factors to determine whether an alter ego situation exists:

(1)     Whether the individual paid little or no consideration;

(2)     Whether the taxpayer placed the property in the individual's name in anticipation of a lawsuit or liability;

14

(3)     Whether there is a close relationship between taxpayer and the individual;

(4)     Whether the taxpayer exercises dominion and control over the property; and

(5)     Whether the taxpayer continued to enjoy the benefits of the property.

Loving Saviour Church v. United States, 728 F.2d 1085, 1086 (8th Cir. 1984);

Shades Ridge Holding Co., Inc. v. United States, 888 F.2d 725, 729 (11th Cir.

1989). The Government argues all the factors are satisfied in this case. The Court

disagrees.

The Court has already addressed these factors in its fraudulent transfer

analysis. The gravamen of the Government's alter ego argument is that Spencer is

actually paying the mortgage on the house and enjoying exclusive use of the

house. To this end, the Government makes much of the fact that Spencer has her

checks deposited directly into Vaccaro's checking account, the account from

which Vaccaro writes the mortgage checks. Although Spencer and Vaccaro both

admit that when Spencer works, she deposits part of her paychecks into Vaccaro's

checking account, the Court finds that these monies are then used to pay

Spencer's living expenses. Spencer is unable to open her own checking account

because the Government keeps levying the accounts, and Vaccaro and Spencer

have provided copies of checks written from Vaccaro's account for Spencer's

personal expenses such as medical insurance, dental bills, driver's license fees, and car insurance.

In addition, the Government has not convinced the Court that Spencer provides the funds Vaccaro uses to write the mortgage checks.  Vaccaro has produced copies of many of her checking account statements for the years 2000 to 2004. Two regular deposits are made into Vaccaro's checking account every month – a Social Security check and a pension check. Every month there are other various deposits, but the Government fails to inform the Court which deposits are supposed to represent Spencer's paychecks. The deposits do not add up to anything close to Spencer's gross income. In fact, for at least one year, deposits add up to more than Spencer's gross income for the year. In addition, many of the statements are incomplete or illegible. Thus, the Court is left to guess at the meaning of the extra deposits.

Moreover, Spencer had so little income in 1998 and 1999 that it would have been impossible for her to pay the mortgage. Spencer had an adjusted gross income in 1998 of $1878 and general assistance income of $4558. Even if Spencer used every bit of her income, she could not have paid the 1998 mortgage payments. In 1999, Spencer had an adjusted gross income of $5132. Again, this was not enough money to pay the monthly mortgage, which ranged from $677.31 in 1998 to $694.15 in 2002. Although Spencer's adjusted gross income increased

to $17,986 in 2000; $12,718 in 2001; and $24,989 in 2002, this does not prove that Spencer continued to pay the mortgage. If Spencer had paid the mortgage in 2001, that would have been all she did. The checks Vaccaro submits to document the payment of Spencer's personal expenses and the total mortgage payments for the year would have taken Spencer's entire gross income. This calculation does not take into account the money withheld from Spencer's paychecks for taxes, or any money necessary to purchase clothing, gas, or anything else.[4] Thus, it was impossible for Spencer to pay the mortgage in 2001. To the extent Spencer arguably made enough money to cover both the mortgage and documented living expenses in 2000 and 2002, the Court is not convinced that she did so. Spencer has stated that she is not able to pay rent or even utilities on a regular basis, and Spencer has not taken a tax deduction for the mortgage payments since the transfer. The Government simply has not provided a sufficient link between Spencer's checks and the mortgage payments.

Furthermore, the Court finds it implausible that at the time of the transfer Spencer would have considered that she would eventually regain financial control over the house such that she would establish an alter ego situation. Spencer's financial condition at the time of the transfer was simply too dire. Thus, the Court

---

[4]Spencer apparently used her child support checks to purchase groceries during this time. (Gov. Ex. C.)

finds the Government's argument that somehow Spencer transferred the house and continued to pay the mortgage disingenuous. If Spencer had been able to pay the mortgage, the house would not have gone into foreclosure in the first place. In short, Spencer's relationship with the house is not the relationship of a homeowner. Therefore, Vaccaro is not Spencer's alter ego, and the Government may not foreclose on the house to satisfy Spencer's tax liens.

Based upon the files, records, and proceedings herein, **IT IS HEREBY ORDERED**:

(1) The Government's Motion for Partial Summary Judgment [Doc. No. 40] is **GRANTED**;

(2) Defendants Linda M. Spencer's and Margaret A. Vaccaro's Motion for Partial Summary Judgment [Doc. No. 44] is **GRANTED**;

(3) The claims against Defendant Margaret A. Vaccaro are **DISMISSED WITH PREJUDICE**; and

(4) Margaret A. Vaccaro is terminated as a Defendant in this case.

DATED: October 17, 2005

s/Michael J. Davis
Michael J. Davis
United States District Court